[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION 
This case arises out of a lease (plaintiff's exhibit 2) by and between E. R. Hoffman, acting therein by Lawrence K. Hoffman as the landlord, and Frank Riccio as the tenant, dated November 29, 1988 for premises located at 1747-1749 East Main Street in Bridgeport. The lease was for a term of six years beginning January 1, 1989 and ending December 31, 1994. Mr. Riccio had been involved with the property since the mid 1970's when, as an attorney, he represented his brother-in-law James Van Duyne as the tenant. In December of 1979, Mr. Riccio himself became the tenant of the subject premises pursuant to a lease (plaintiff's exhibit 3) for a period of ten years commencing on January 1, 1980 and ending December 31, 1989. The business conducted on the premises at all times was a variety store with assorted food items, drinks, newspapers and magazines called News Plus. The premises are located at the corner of East Main Street and Boston Avenue and contain five to six stores in a single story building. Originally, the premises, totaling 2,000 square feet, were divided by a wall which was eventually removed by the tenant to produce one large area.
There does not appear to be any controversy concerning the validity of the lease in question, plaintiff's exhibit 2, wherein the defendant agreed to lease the premises at 1747-1749 East Main Street for a period of six years beginning January 1, 1989 through December 31, 1994. The defendant had been the previous tenant of the premises pursuant to a lease running from January 1, 1980 through December 31, 1989, so the new lease was negotiated and commenced one year before the earlier lease terminated. Both sides have their own explanations as to the reasons for the early renewal, which are not essential to a determination of this case. The plaintiff claims it is in the usual course of business to do CT Page 9374-a this and Mr. Riccio was extremely unhappy with the cost of living, increase in his rental payments under the old lease. Mr. Riccio's explanation seems to be that he was satisfied with the oral commitment regarding repairs to the premises that he was given by Maurice Hoffman, the husband of the plaintiff E. R. Hoffman and the father of Lawrence Hoffman who acted as the agent of E. R. Hoffman on the lease in question.
No specific claim has been made that the lease agreement was amended or altered by any oral statements by anyone associated with the Hoffmans, and the court finds there to be none. There was testimony as to conversations between the defendant and Maurice Hoffman in 1988 during the negotiations leading up to the lease in question. Those discussions are material to the overall condition of the premises and the special defense of constructive eviction proferred by the defense in this case. Suffice it for now to state that in paragraph 27 of the rider to the lease dated November 29, 1988, the clause reads, "The tenant does not stipulate that the plumbing and heating are in good working order nor does the tenant stipulate that the floor is in good condition."
Before embarking on an examination of the building's condition, it is of some importance to examine the relationship of the parties in this case. The premises in question were initially owned by Maurice Hoffman who, on November 12, 1976, leased the premises to the defendant's brother-in-law James Van Duyne. (Plaintiff's exhibit 4) Apparently by 1977, the premises were owned by Maurice Hoffman's wife, E. R. Hoffman as she is listed as the landlord in all subsequent leases. She always acted through an agent and there is no evidence that she had any knowledge of these premises or the negotiations leading up the subsequent leases.
In the early years, the defendant testified that most if not all of his dealings concerning the property were with Maurice Hoffman. As the years passed, Mr. Hoffman's son, Lawrence, became more actively involved. The relationship between the senior Mr. Hoffman and Mr. Riccio was very close. In two curious questions asked of Mr. Riccio by plaintiff's counsel, Mr. Riccio answered in the affirmative that Mr. Hoffman treated him like a son and to another question that on occasions treated him better than his own father. Mr. Riccio testified that there never would have been a lawsuit between himself and the senior Mr. Hoffman. It is curious to note that the death of the senior Mr. Hoffman in 1995 and the return day of this writ were only two days apart. The dealings between Mr. Riccio and Lawrence Hoffman were businesslike but not unfriendly.
In the court's view of this case, the only real issue concerns the CT Page 9374-b defendant's second special defense which, in legal terms, is a claim of constructive eviction because of the untenantable conditions of the premises. The law of constructive eviction is not complicated and is set out below.
 Where the landlord's failure to repair, whether predicated upon an agreement of the parties or by operation of law, results in rendering the premises untenantable, the tenant has been effectively and wrongfully evicted and has a right to recover such damages as she has sustained as a result of such wrongful eviction. "Untenantable" or "untenantability" means something more than the mere failure to make repairs. The failure to repair must result in making the premises untenantable. See, 49 Am.Jur.2d Landlord and Tenant, secs 313, 315. And, for the premises to be untenantable there must be a serious or substantial, as distinguished from a minor or insubstantial, interference with the tenant's use of the premises. Conference Center Ltd. v. TRC, 189 Conn. 212, 221
(1983); SHVC, Inc. v. Roy, 37 Conn. Sup. 579, 585
(1981); 49 Am.Jur.2d Landlord and Tenant, secs 313, 315. In other words, it must be so serious as would justify the tenant abandoning the premises. 49 Am.Jur.2d Landlord and Tenant, sec 576. In fact, in order to take advantage of this doctrine, the tenant must abandon the premises. Wenk v. Bidwell, 136 Conn. 603, 609 (1950).
 Whether there has been such an interference is a question of fact to be determined "in each case after a careful consideration of the `situation of the parties to the lease, the character of the premises, the use to which the tenant intends to put them, and the nature and extent by which the tenant's use of the premises is interfered with by the injury claimed.'"
Thomas v. Rober, 162 Conn. 343, 347, 349 (1972).
If the defendant fails in its proof of this special defense, the court would be required to render judgment for the plaintiff and then undertake the question of damages occasioned by the breach with due consideration of any claim regarding mitigation of damages. On the other hand, if the court finds this defense proven, the judgment would be for the CT Page 9374-c defendant.
To begin with, let me opine in saying that the court has no reason to believe that either of the principals here, Mr. Hoffman or Mr. Riccio, would consciously falsify their testimony in this case, and yet, their respective versions of the circumstances here are dramatically opposed. Both men are businessmen and lawyers and comported themselves in court in a respectable manner. Their differences are in degrees, perspective, objectivity and their own perceptions which are obviously affected by the outcome of this case. It is, therefore, the court's responsibility to review dispassionately all of the evidence in the case which it will do now.
The problems concerning the conditions of the premises began almost immediately after the defendant's involvement with the property. In a letter dated September 15, 1977 to Milton Davis at Hoffman Brothers (defendant's exhibit C) the defendant complained of the problems with reference to insulation and heating and air conditioning problems which he claims plagued them the previous summer. Again, on December 28, 1981, by letter (plaintiff's exhibit 17), the defendant wrote Hoffman Brothers concerning the problems with the electrical service, the insulation, the sunken floor and the heating system. On February 4, 1982 in a letter to Maurice Hoffman (defendant's exhibit D), Mr. Riccio again described the heating, plumbing and electrical systems as well as the floor as "in desparate [desperate] need of major renovation." These complaints continued almost continuously leading up to the negotiations of the new lease dated November 29, 1988.
The defendant claims that almost all his discussions concerning the condition of the premises and the promised repairs occurred with Maurice Hoffman. He claims that Maurice Hoffman promised to remedy the problems concerning the heat, the air conditioning, insulation, the sunken floor and the leaking roof. The defendant also testified that he requested that the commitment be put into writing in the new lease, but Maurice Hoffman refused to do so. The best the defendant could do was get into paragraph 27 of the rider to the lease, the language that, "The tenant does not stipulate that the plumbing and heating are in good order nor does the tenant stipulate that the floor is in good condition." That at least demonstrates that the problems related to these items had not been resolved.
Although the defendant claims he was induced to sign the new lease by the promises of repairs by Maurice Hoffman, those statements, even if true, never became a part of the new lease. They were admitted only to CT Page 9374-d support the claims of the continuing deterioration of the premises. Mr. Riccio testified that all of the building defects continued to deteriorate until he was forced to vacate the premises in March of 1991.
On the other hand, Lawrence Hoffman testified that he was the property manager of the premises in question for most of Mr. Riccio's tenancy. He described the premises at the beginning of the defendant's tenancy as in good condition and, with certain exceptions which will be discussed shortly, that they remained that way. He admitted that the defendant made some oral and written complaints about the condition of the premises which were either fixed or the defendant withdrew them. He further indicated that he was on the premises regularly so knew of its condition.
With reference to ceiling insulation, he testified he agreed to supply it, but its installation would require the defendant's business to be closed to complete the work, which the defendant refused to do. He claimed that the heating system worked fine, but the problem was the lack of proper insulation. He claims there were some plumbing problems that he had fixed. He further claims that the roof was in good condition with the exception of periodic leaks during severe storms which he had fixed after the storms subsided. With reference to the floor, he admitted that it had sunk on the right side of the premises and he agreed to fix it, but again the defendant would have to close his store anywhere from two to four weeks. This the defendant could not do because he would lose his customer base if he closed down for that long. The defendant asked that some other form of access to the store be provided during the floor repair, but none was ever provided. The floor was not repaired until after the defendant vacated the premises. For a better understanding of the condition of the floor, reference is made to photos marked as defendant's exhibits L, O and II.
Lawrence Hoffman testified that he alone was involved in the negotiations with the defendant for the new lease dated November 24, 1988. He claims Mr. Riccio's main concern was eliminating the cost of living escalator clause in the old lease and showed little interest in the condition of the premises. He claims he made no commitment to the defendant for repairs or renovations to the premises to induce the defendant to sign the new lease, and he was sure his father made no such commitments.
As to the condition of the premises, the plaintiff also offered the testimony of Hjalmar Norrell, a builder, who testified he worked for the Hoffmans for many years doing repairs to their various buildings CT Page 9374-e including the premises at issue here. He described the roof as in good shape although he went to the premises two to three times a year to repair leaks. He described the problem of the sinking floor and his conversation with the defendant that he would have to close his business down in order to fix it. When told that the defendant could not do that, Norrell referred him back to the Hoffmans. He admitted there were several missing ceiling tiles which would account for a loss of heat.
Mr. Norrell repaired the floor after the defendant vacated the premises. He admitted that there was a dangerous condition in the ceiling and he would not allow his workers to repair the floor until he repaired the ceiling lighting and wiring. He then also retarred the roof and then eventually put on a new roof in 1994.
The defendant called seven witnesses as to the condition of the premises whose testimony must be summarized because of the defense of constructive eviction.
John Rampino, a former employee of News Plus and now living in Hermitage, Tennessee testified he was employed there from 1983 to 1989, full time as day manager until 1986 and thereafter part time. He described the roof leaking as an ongoing problem, getting worse and several buckets had to be placed on the floor when it rained. This caused ceiling tiles to fall and merchandise had to be constantly moved. He described the floor caving in and where the outside wall met the floor you could see daylight, and if it snowed, the snow came into the store through the break. He said it was necessary to put plywood down so they could work. He said the heating system was so poor that they had to keep the water running in the sink to avoid pipes freezing and that he had to wear a hat, coat and gloves in the winter inside the store to keep warm. In the summer it was so hot inside that despite the defendant installing two air conditioners they had to put the chocolates in the freezer to avoid melting. He further described rust stains in the ceiling and the toilet area as old and shaky. He further described a conversation he heard in late 1988 between the defendant and Maurice Hoffman concerning the lease renewal wherein Hoffman stated "repairs will be made" and "it will be right for you."
Anthony Gonsalves also testified for the defense. He indicated he started going to the premises in 1982 and in 1988 was there almost every night and that he sometimes worked there. He admitted during that time he was going under the name of Anthony Oliver as he was working undercover for Massachusetts police authorities and the Bridgeport State's Attorney's office. He described the condition of the premises as poor and CT Page 9374-f that when it rained outside, it rained inside. He stated it was necessary to cover merchandise with plastic to divert the water into buckets. He described water stains on the walls and ceilings. He described the winter temperature inside the store as very cold requiring heavy clothes. He described the condition of the furnace in 1988 as old, rusty and providing insufficient heat. He also described summer conditions as unbearable requiring the chocolates to be put in the freezer. He confirmed the condition of the sinking floor.
He further testified that he and his principal, a Mr. Pina from New Bedford, Massachusetts, had an interest in leasing the subject premises at or about the time the defendant vacated. He described his negotiations with Lawrence Hoffman. In fact, he signed an undated lease in 1991 for the premises under the name Anthony Oliver, but did not provide the $4,000 security deposit. Mr. Hoffman did not sign the lease because of the absence of the security deposit. Gonsalves testified he would not provide the deposit unless repairs were made or a commitment to make them was contained in the lease. He claims Mr. Hoffman refused to do so. Mr. Hoffman denied that the subject of repairs was the reason for the non-payment of the deposit.
John Solomon, a former Chief Inspector in the Bridgeport State's Attorney's office and now Chief of Police in Easton testified that he knew Mr. Gonsalves as Anthony Oliver, and from 1982 to 1991, Mr. Oliver often worked as an undercover agent for his office. He met him on numerous occasions at News Plus and often was there for more than an hour. He confirmed the sagging floor in the area of the store, the plywood on the floor, the fact that it was very hot in the summer and very cold in the winter within the store and that when it rained there was lots of water inside the store, plastic to protect merchandise and buckets to collect water.
Stephanie Joseph testified that she was often in the store in 1990 and early 1991. Mr. Riccio had represented her mother in an accident case and she had some interest in the premises as a potential new tenant. She described the premises as in bad repair with the floor caving in, the winter temperature inside the store as very cold, very hot in the summer and that when it rained you needed an umbrella inside the store.
Ramel Peppers testified that she worked for the defendant for ten years at the store from 1982 through 1991, usually working from 5:00 a.m. to 3:00 p.m. As of 1991, she described the inside of the premises as follows: the flooring on one side was collapsing and you could see outside from the opening and in the winter it was necessary to stuff rags CT Page 9374-g in the crack to keep out the cold air and the snow. She described the roof leaks as so bad that when it rained you might as well be outside in it. Many buckets were required to catch the water. She described water getting into the light fixtures. She described the toilet area as awful and she was concerned that it would fall through. It was so bad that she went to another store to use the bathroom. She described the summer temperature inside the store as hotter than outside and the winter temperature so cold that she had to wear a coat, scarf and gloves.
A Mr. Christensen then testified that he worked as a cashier for the defendant at News Plus from 1987 until the defendant vacated the premises in March of 1991. He described the sinking floor, that the condition was getting worse and how they stuffed the opening between the floor and the outside wall to keep the elements out. He testified that whenever it rained the water came into the store and they now used large garbage cans to catch the water. He described electrical fixtures in the ceiling as getting wet, sparking and requiring the electricity to be turned off. He helped the defendant relocate his inventory to his new store after he left the subject premises and how he came back to clean up the premises and took several pictures of the empty store. These pictures have been introduced as defendant's exhibit K, J, L, M, N, O, P, V, X, Y, BB, FF, GG 1 — 5, HH, II, JJ, LL. They generally show the water damage to the ceiling, the sunken floor, the rusted furnace, the toilet conditions which, to put it mildly, are worth a thousand words. They show conditions that are barely habitable.
After the defendant vacated the premises and Mr. Norrell did the work previously described, the store remained vacant until July 1, 1993 when new tenants, Adriana Ducran and Pamela Newland, signed a new two year lease for the subject premises (plaintiff's exhibit 7) to run a clothing store. Their rent was $800 a month, less than one half what the defendant was paying. Adriana Ducran testified for the defense that when she occupied the premises on July 1, 1993, the premises needed a lot of fixing up and the landlord, Lawrence Hoffman, waived the first four months' rent so she could fix what needed to be fixed. She described the leaking roof and water coming through the ceiling each time it rained heavily. She continued to use buckets to catch the water. She described her first winter on the premises stating that it remained very cold even when she put the heat up. She was forced to get fuel oil every two weeks. She stated that it was so cold inside that she would sit in her car in front of the store until a customer came by.
The defendant testified that all of the conditions became progressively worse as time passed. He could not keep employees and his business was CT Page 9374-h diminishing because competitors had better facilities. When he finally realized that the necessary repairs were not going to be made and that the premises were virtually uninhabitable, he determined his only recourse was to leave and he vacated the premises, but only after writing several letters to the landlord. See defendant's exhibits A, B and plaintiff's exhibits 18, 19 and 20. The plaintiff maintains that in exhibits 18, 19, and 20, all written in February of 1991 by Mr. Riccio to Lawrence Hoffman wherein he states he is leaving the premises, there is no mention that he is leaving because of the' poor condition of the premises but because he was losing money. It is not inconsistent to conclude that the defendant was losing money because of the poor condition of the premises and they had reached the stage of being untenantable. The nature of the defendant's business was high traffic, high volume and low cost items.
As to defendant's exhibits A and B, which the defendant states he sent to Maurice Hoffman and Lawrence Hoffman respectively, Lawrence Hoffman testified he had never seen these letters before and they were not in his file. The letters do clearly link the deplorable condition of the premises to the defendant's terminating the lease. The term constructive eviction was first used in defendant's exhibit B, and it was again used in plaintiff's exhibit 25, a letter from the defendant's then lawyer Dennis P. Harrigan to E. R. Hoffman dated September 12, 1991.
The plaintiff claims that the defendant breached the lease because his business was being hurt by two new competitors in the area and not because of the condition of the premises. That simply is not supported by the evidence. Within two days of vacating these premises, the defendant reopened News Plus in a new store within four to five stores away from the premises he vacated. If competition was the problem, he would hardly have reopened in the same area of the new competition.
The court has reviewed the briefs filed by each party and read all attached memoranda. The cases cited, although instructional on the law, are not particularly helpful because every factual situation is different. As has been previously stated, each case depends on the situation of the parties to the lease, the character of the premises, the use to which the tenant puts them and the nature and extent by which the tenants use of the premises is interfered with by the injury claimed.
The plaintiff's position appears to the court to boil down into three basic premises:
1. that the premises were in good condition throughout the defendant's CT Page 9374-i tenancy with the exception of minor repairs that were performed;
2. That if the premises were in fact as bad as the defendant claims, he waived those defects by continuing his tenancy; and,
3. That whatever the condition of the premises were, it had nothing to do with his vacating of the premises in March of 1991 because he said he was leaving because he was losing money.
The defendant's position boils down to the fact that the conditions of the premises were always bad, that they became worse over time, that they eventually became deplorable and finally untenantable. For the premises to be untenantable, there must be a serious or substantial as distinguished from a minor or unsubstantial interference with the tenant's use of the premises. After reviewing all of the evidence, both oral and documentary and the numerous photographs, the court concludes that by the time the defendant vacated the premises those premises were untenantable. Any fair evaluation of the subject premises as shown in the photos taken by Mr. Christensen can only describe these premises as deplorable and as an indication of a continuing and deteriorating condition.
Let us examine more closely the factors that the court should consider in making this decision. The first factor is the situation of the parties to the lease. In this case, although E. R. Hoffman was listed as the landlord in the 1988 lease, it is clear that her husband, Maurice Hoffman, was the person the defendant dealt with most often and it was his word that the defendant trusted. As was developed by plaintiff's counsel himself, the relationship between Maurice Hoffman and the defendant was like father and son. The defendant testified that he trusted Maurice Hoffman implicitly and it was his assurances in 1988 that all the defects in the premises would be taken care of to the defendant's satisfaction that induced him to sign plaintiff's exhibit 2. The defendant's testimony on that subject was substantiated by Mr. Rampino.
The second consideration listed in the cases is the character of the premises. The building was obviously old and the photos offered into evidence painted a clearer picture of the character of the premises than words could possibly explain or improve upon.
The third factor for the court's consideration is the use to which the tenant intends to put the premises. The use from the mid seventies until March of 1991 never changed. It was always a news and variety store called News Plus, a type of use that virtually everyone is familiar CT Page 9374-j with. This is not a big item store. You do not go there to buy a television or a diamond ring. It is a high volume, high traffic and small item facility. It must generate lots of customers over long hours to make the business profitable. The defendant testified that you cannot close this type of business down to do repairs because the customers will go somewhere else. In other words, it is not the kind of store that generates customer loyalty.
The court recalls that the defendant testified that he could not close the store down to either add insulation or repair the sinking floor. The floor in particular was a problem because in order to fit it Mr. Norrell testified that because of the location of the problem, he would have to block off the only door to the premises for a considerable period of time. The landlord offered no solution to this problem. Even when the floor was fixed after the defendant vacated, Mr. Norrell would not allow his workers in before the electrical problems in the ceiling were fixed. Apparently, that safety concern was not afforded the defendant's customers or employees.
The final factor for the court's consideration is the extent to which the tenant's use of the premises is interfered with by the conditions claimed. The court is not going to reiterate everything previously described by several defense witnesses who spent vast amounts of time on the premises. They have described in minute detail the problems concerning the lack of heating and air conditioning, sunken floor, leaking roof, fallen tiles, faulty electricity and substandard plumbing. The court finds these conditions were continuing but deteriorating.
At the beginning, the roof leaks were described as occurring during severe storms; by the end, they were described as needing an umbrella inside whenever it rained, that you might as well be outside when it was raining and they had gone from buckets to garbage cans to collect the rain inside the store.
The court finds that the defects within the premises when the defendant vacated far surpassed the mere failure to make repairs, that the conditions were serious and substantial and that the defendant had been effectively and wrongfully evicted.
The court will briefly discuss two points the plaintiff continually mentions that she believes supports the plaintiff's position. The court concludes that both positions are more consistent with the defendant's position. First, the plaintiff refers to the letters sent by Mr. Ricco to the Hoffmans in February of 1991 prior to his vacating wherein he CT Page 9374-k threatens to vacate. They clearly talk of the money he is losing and make no specific mention of the premise's defects. That might be significant if there were not 15 years of complaints preceding those letters. In addition, the condition of the premises is set forth clearly in defendant's exhibits A and B. The defendant testified that the premises were deteriorating rapidly, that he could keep help and his loss of business can easily be traced to these conditions.
Can you picture a prospective customer of a store such as News Plus continuing to do business there when it is freezing in the winter, when the floor is sinking, when the rain pours in through the ceiling when it rains, when electrical fixtures arc, when there is any viable alternative within miles?
The plaintiff further argues that when the defendant relocated his business within two days of vacating the subject premises and within a block of the subject premises that that somehow demonstrates he left because business was bad, he had two new competitors and not because of the untenantable condition of the premises. The court concludes that these events more than support the defendant's position. The plaintiff has implied that the defendant left because of new competition in the area and that he was losing money. If that was true, why would he possibly relocate right within the same neighborhood.
Based on everything previously stated, the court finds that the defendant has sustained his burden of proof on his Second Special Defense of construction eviction and judgment will enter for the defendant.
GORMLEY, J.